UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| W&T OFFSHORE, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:24-cv-01352 |
| | § | |
| CRESCENT MIDSTREAM LLC, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF W&T OFFSHORE, INC.'S RESPONSE TO
DEFENDANT'S OPPOSED EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

EXHIBIT LIST .................................................................................................... v

FACTUAL BACKGROUND ............................................................................... 1

LEGAL STANDARD .......................................................................................... 7

ARGUMENT ....................................................................................................... 9
    A.    Crescent Seeks to Upset the Status Quo. ............................................. 10
    B.    Crescent's Delay Dooms its Request for Relief. ................................. 10
    C.    Crescent Cannot Clearly Prove Any of the Required Four Factors. ..................... 13
        1.    Crescent Is Unlikely to Succeed on the Merits. ....................................... 13
        2.    Crescent Will Not Suffer Irreparable Injury. ............................................ 16
        3.    Crescent Cannot Show that the Equities Favor It. .................................... 19
        4.    A TRO Will Disserve the Public Interest. ................................................ 20

CONCLUSION .................................................................................................... 20

CERTIFICATE OF SERVICE ............................................................................ 22

# TABLE OF AUTHORITIES

Page(s)

Cases

*Affiliated Prof'l Home Health Care Agency v. Shalala,*
   164 F.3d 282 (5th Cir. 1999) ........................................................................ 8
*Aransas Project v. Shaw,*
   775 F.3d 641 (5th Cir. 2014) ...................................................................... 18
*Bay Matrix, Ltd. v. Big Guns Petroleum, Inc.,*
   2017 WL 7052221 (S.D. Tex. Nov. 29, 2017) .......................................... 15
*Bluefield Water Ass'n, Inc. v. City of Starkville,*
   577 F.3d 250 (5th Cir. 2009) ........................................................................ 8
*Boire v. Pilot Freight Carriers, Inc.,*
   515 F.2d 1185 (5th Cir. 1975) .................................................................... 11
*Burgess v. Fed. Deposit Ins. Corp.,*
   871 F.3d 297 (5th Cir. 2017) ................................................................. 18, 19
*Clark v. Prichard,*
   812 F.2d 991 (5th Cir. 1987) ...................................................................... 17
*Connell v. Dulien Steel Products, Inc.,*
   240 F.2d 414 (5th Cir. 1957) ...................................................................... 17
*Crossover Mkt. LLC v. Newell,*
   2022 WL 1797359 (W.D. Tex. Jan. 12, 2022) .......................................... 11
*Darryl George, et al. v. Greg Abbott, et al,*
   2024 WL 4468506 (S.D. Tex. Oct. 10, 2024) ............................................ 12
*Digerati Distrib. & Mktg., LLC v. Conradical Sarl,*
   2023 WL 5687040 (W.D. Tex. Aug. 2, 2023) .............................................. 8
*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,*
   389 S.W.3d 802 (Tex. 2012) ................................................................. 19, 20
*Embarcadero Techs., Inc. v. Redgate Software, Inc.,*
   2017 WL 5588190 (W.D. Tex. Nov. 20, 2017) ........................................ 12
*Enter. Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
   762 F.2d 464 (5th Cir. 1985) ...................................................................... 18
*Green Ice Tech. v. Ice COLD 2, LLC,*
   2017 WL 11667640 (E.D. Tex. July 7, 2017) ........................................... 12
*Harris v. Wilters,*
   596 F.2d 678 (5th Cir. 1979) ........................................................................ 9
*Hoover v. Morales,*
   164 F.3d 221 (5th Cir. 1998) ................................................................. 17, 20
*Horner v. Am. Airlines, Inc.,*
   2017 WL 978100 (N.D. Tex. Mar. 13, 2017) .............................................. 7
*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ...................................................................... 18

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
   747 F. Supp. 1218 (N.D. Tex.) ........................................................................ 8
*Lakedreams v. Taylor*,
   932 F.2d 1103 (5th Cir. 1991) ...................................................................... 18
*Las Americas Immigrant Advocacy Ctr. v. Paxton*,
   2024 WL 4430542 (W.D. Tex. Sept. 27, 2024) .................................... passim
*Martinez v. Matthews*,
   544 F.2d 1233 (5th Cir. 1976) .................................................................. 8, 10
*M-I LLC v. Argus Green LLC*,
   2010 WL 11527419 (E.D. Tex. July 13, 2010) ............................................ 13
*Norman Bridge Drug Co. v. Banner*,
   529 F.2d 822 (5th Cir. 1976) ........................................................................ 17
*Ocusoft, Inc. v. Walgreen Co.*,
   2017 WL 1838106 (S.D. Tex. May 8, 2017) .................................................. 8
*PaR Sys., Inc. v. iPhoton Sols., LLC*,
   No. 4:10-CV-393-Y, 2011 WL 13128976 (N.D. Tex. Feb. 11, 2011) .......... 18
*Sampson v. Murray*,
   415 U.S. 61 (1974) ........................................................................................ 19
*Shores v. Hayashi*,
   2023 WL 3230926 (D. Haw. May 3, 2023) .................................................. 13
*Symetra Life Ins. Co. v. Rapid Settlements Ltd.*,
   612 F. Supp. 2d 759 (S.D. Tex. 2007) .................................................... 10, 11
*Tex. v. United States*,
   328 F. Supp. 3d 662 (S.D. Tex. 2018) .......................................................... 12
*Urban Edge Network Inc. v. Webber Mktg. & Consulting, LLC*,
   2023 WL 2825697 (N.D. Tex. Mar. 13, 2023) .............................................. 11
*Valley v. Rapides Par. Sch. Bd.*,
   118 F.3d 1047 (5th Cir. 1997) ........................................................................ 8
*Voting for Am., Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) .......................................................................... 9
*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .................................................................................... 16, 17
*Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*,
   2006 WL 1540587 (N.D. Tex. June 6, 2006) ................................................ 11
*Ysleta del Sur Pueblo*,
   2018 WL 1566866 (W.D. Tex. Mar. 29, 2018) .............................................. 8

Rules

Fed. R. Civ. P. 65(b)(2).................................................................................... 17

**EXHIBIT LIST**

Exhibit 1(a): Declaration of William Williford

Exhibit 1(b): Central Operations Map

Exhibit 2: Mar. 7, 2024 W&T First Letter of Notice of Default to Crescent

Exhibit 3: June 18, 2024 W&T Second Letter of Notice of Default to Crescent

Exhibit 4: Dedication and Transportation Services Agreement

Exhibit 5:  Platform Pipeline Connection and Access Agreement

Exhibit 6: Feb. 27, 2024 Letter from Crescent to W&T

Exhibit 7: Mar. 27, 2024 Crescent Letter to W&T

President Biden was still running for reelection back when W&T terminated the parties' contracts and Crescent asserted its counterclaims. Yet only now, months later, does Crescent come to this Court with what it labels an "emergency" application for a TRO and preliminary injunction. There is no emergency. Crescent tries to conjure one up by citing a supposed October 31 deadline for testing valves. It offers no justification for waiting until two days before that supposed deadline to seek a TRO, when the lawsuit has been pending for more than six months. That delay alone warrants denying the TRO. What is more, Crescent cites no real evidence the Halloween deadline even existed, only its conclusory affidavit saying so. *See* Dkt. 32 at 2 (citing Crescent Ex. 1 ¶31). And W&T will agree to allow access for any government-mandated safety inspection.

With the fake "emergency" out of the way, what remains is a routine contract dispute that—though of great significance to the parties—is the type that courts hear every day without the need for the drastic remedy of a TRO. That remedy is even more severe here because Crescent is asking this Court to upset the status quo and require W&T to resurrect a contract and give Crescent access to W&T's platform months after the parties' relationship ended. *See* Mot. 18. It is not surprising, then, that Crescent is unable to establish a single one of the four requirements for a TRO.

Crescent's extraordinary and belated request for a TRO should be denied. W&T requests that the Court set a hearing on the request for a preliminary injunction motion which can then receive a fulsome hearing after any additional briefing.

## FACTUAL BACKGROUND

Crescent asks the Court for a mandatory injunction to compel specific performance of two contracts that terminated more than four months ago. The contracts terminated after Crescent defaulted and W&T provided Crescent two notices and an opportunity to cure, to no avail. *See* Ex. 2, Mar. 7, 2024 W&T First Letter of Notice of Default to Crescent; *see also* Ex. 3, June 18, 2024 W&T Second Letter of Notice of Default to Crescent. As a result, Crescent has not had access to

- 1 -

W&T's platform since for months. *See* Ex. 1(a), Declaration of William Williford. Months after its default, Crescent seeks via judicial decree that access to which it no longer has a contractual right.

      ***The Parties.*** W&T is the owner and operator of offshore wells located on West Delta Block 73, West Delta Block 74, West Delta Block 91, West Delta Block 92, and West Delta Block 93 ("Dedicated Area"). Crescent is the operator of certain pipeline segments, pipelines, and related fixtures, infrastructures, meters, connections, and interconnections ("Pipeline System") offshore of Louisiana.

      ***The Contracts.*** At the beginning of this year, W&T and Crescent entered into a Dedication and Transportation Services Agreement ("Transportation Agreement"), effective January 16, 2024. *See* Ex. 1(a) ¶5; Ex. 4. That agreement arose out of W&T's purchase of certain assets, including the Dedicated Area, from Cox Operating, L.L.C. and related parties as part of a Chapter 7 bankruptcy. Under the Transportation Agreement, Crescent must transport crude petroleum and produced water on behalf of W&T from the Dedicated Area over and through the Pipeline System to a facility onshore near Grand Isle, Louisiana. *See* Ex. 1(a) ¶5.



Exhibit 1(b).

W&T and Crescent also entered into a related Platform Pipeline Connection and Access Agreement ("Access Agreement") that granted Crescent access to W&T's West Delta 73 A platform. *See* Ex. 5. Because the Access Agreement is derivative of the Transportation Agreement—it provides access so Crescent can perform its transportation obligation—the Access Agreement, by its terms, terminates when the Transportation Agreement is terminated. *See id.* ¶8.

Historically, Crescent's Pipeline System and the platforms located on West Delta 74 had served a single producer (most recently, Exxon—and other ownership of the Pipeline System and platforms in unity before that), which placed crude oil and produced water into the pipeline at various points along the system. *See* Ex. 1(a) ¶7. Notably, multiple oil platforms transported oil through the same pipeline system. *See id.* During unity of ownership between the Pipeline System and the platforms (before the Cox bankruptcy and subsequent asset sale), because there was only a single producer that had to be credited with the crude oil produced at the end point, Crescent could easily measure the crude at the end of the pipeline without having to allocate among different producers. However, after the assets along the pipeline were necessarily divided up, which meant that the production of different entities was commingled as it is entered into the Pipeline System. Accordingly, Crescent now must allocate the proper volume of crude petroleum and produced water that each entity transports through the system for at least two reasons: 1) so the correct tariff can be charged to each entity and, 2) so that each entity is allocated its correct volume of crude for sale on the market.

This allocation issue was a focus of the W&T-Crescent negotiations and the contracts that resulted. *See* Ex. 1(a) ¶8. The parties knew that the testing and allocation methodology that was being used before W&T's purchase of the assets had under-allocated the volume of crude

petroleum attributable to assets in the Dedicated Area. *See id.* For that reason, W&T and Crescent addressed the allocation issue. The negotiations culminated in W&T and Crescent agreeing that, until W&T purchased and installed new equipment (by January 2025) to replace the existing testing equipment, Crescent would calculate the volume of oil versus water utilizing existing equipment at W&T's facilities. *See* Ex. 4 §3.6. And to ensure that measurements of oil were not erroneously deflated, the Contract expressly prohibited Crescent from reducing the measurements of W&T's production by a terminal production factor:

> For the avoidance of doubt, under no circumstance shall the Actual Shipments be subject to or reduced by a terminal production factor, terminal water factor or any other terminal factor referenced in or utilized in connection with the Grand Isle Terminal Allocation Process.[1]

The parties' negotiations addressed another concern. *See* Ex. 1(a) ¶8. As Crescent admits, it knew during negotiations about the possibility that the Bureau of Safety and Environmental Enforcement of the United States Department of the Interior ("BSSE") would shut in platforms and facilities, including crossover pipelines, which would impact transportation of W&T's production. Dkt. 32 at 6-7.

As a result, the Transportation Agreement qualifies the Force Majeure provision that is a focus of this lawsuit.  Although a breach due to an event that constitutes a legitimate "Force Majeure" is not deemed a default, Ex. 4 §9.1, the asserted Force Majeure event must be "outside the reasonable control of the affected Party and not avoidable through the exercise of reasonable diligence and commercially reasonable efforts." *Id.* at 3. So in anticipation of scenarios in which governmental authorities could suspend the pipelines, the Transportation Agreement requires the exercise of "reasonable diligence to prevent" such suspension. *Id.*

---

[1] Ex. 5 §3.6.

*Crescent Breaches the Transportation Agreement.* Despite the explicit terms of the Contract, Crescent applied a terminal production factor to the product received at its facility onshore to calculate Crescent's January and February volumes. *See* Ex. 1(a) ¶10. That violation of the contract over-allocated water and under-allocated oil to W&T, resulting in a vast underpayment to W&T for its production.

Then, on February 27, 2024, Crescent notified W&T that it would not be fulfilling its obligations under the Transportation Agreement because BSSE shut-in facilities at the Grand Isle Block 22 Platform L (the "Platform"), which Crescent was crossing to transport W&T's production. *See* Ex. 6. Two weeks earlier, on February 12, 2024, the Chief Restructuring Officer of MLCJR, LLC and its affiliated debtors had sent a letter to the federal government stating that the debtors were no longer able to fund their obligations for various leases, including the Platform that Crescent's Pipeline System ran through to transport W&T's production. *Id.* Crescent's February 27 letter to W&T asserted that this constituted Force Majeure and excused its nonperformance, even though Crescent had long known about the risk and did little to prevent or work around the shut-in. *Id.*

Despite knowing about the risk of the shut-in, Crescent did not make any filings to BSSE or attempt to be pre-emptively designated the debtor's agent, did not ask the government to carve out the area of the Platform from the shut-in order before the shut-in occurred, did not attempt to be assigned or named contract operator by the debtor with respect to the Platform only, or make plans for a workaround to re-route W&T's production to avoid the shut-in Platform. *See* Ex. 1(a) ¶12. Crescent simply shirked these and other commercially reasonable actions.

The following week, on March 7, 2024, W&T responded to Crescent's letter, explaining that the circumstances did not qualify as a Force Majeure because Crescent had not exercised

"reasonable diligence and commercially reasonable efforts" Ex. 2 at 2. W&T provided notice that Crescent's failures constituted a material breach that gave rise to a default. *Id.* In the same letter, W&T also reiterated—as it had previously "notified Crescent several times"—that Crescent was in breach of Section 3.6 (Allocation) of the Transportation Agreement because it "continued to reduce the Actual Shipments by a terminal production factor." *Id.*

W&T's letter constitutes written notice of the dispute under the Transportation Agreement. *See* Ex. 1(a) ¶14. It explains W&T's position as well as its understanding of Crescent's position, offers an opportunity for Crescent to cure its defaults, and identifies who would represent W&T in attempts to resolve the dispute. Ex. 4 §§ 9.2, 15.7.

Three weeks later, on March 27, 2024, Crescent's response all but confirmed W&T's position. Ex. 7, Mar. 27, 2024 Crescent Ltr. to W&T. Crescent did not deny knowing about the possible shut-in for weeks before it occurred, nor did Crescent identify any efforts it had taken to prevent or work around the shut-in. *Id.* And even though the shut-in had taken place a month and a half earlier, all Crescent could say was that it was "using due diligence" to determine "options" for "modification of the shut in order." *Id.* at 1. With respect to the allocation default, Crescent simply denied using a terminal production factor, terminal water factor, or any other terminal factor, despite its plainly skewed measurements of W&T's production. *See* Ex. 1(a) ¶15. Crescent took the position that it "owes no cure to W&T under Section 9.3." *Id.* at 3.

***Termination.*** W&T continued to negotiate with Crescent, but those efforts did not succeed. *See* Ex. 1(a) ¶17. With no progress on the horizon and Crescent's recalcitrance in curing its defaults, W&T sent Crescent a second default notice on June 18, 2024. That notice terminates the Transportation Agreement under Section 9.3(b) and notes that as a result the wholly dependent Access Agreement also terminates. Ex. 3. The default notice identifies the following material

breaches: "(1) failure to exercise reasonable diligence and commercially reasonable efforts to prevent the shut-in of the Pipeline System; and (2) applying a terminal production factor to artificially reduce W&T's Actual Shipments based on an erroneous allocation." *Id.* at 2.

Although Crescent now asserts that injunctive relief is needed to allow it imminent mandatory safety inspections of valves on its pipeline system, W&T will grant access for any government-mandated safety inspection and simply requests that Crescent submit to W&T proof of reasonable insurance and execute a standard boarding agreement.

***Procedural Background.*** Given Crescent's constant refusal to cure, W&T filed this lawsuit on April 12, asserting breach of contract and other claims. Dkt. 1. On May 30, Crescent filed its Answer and Counterclaim. Dkt. 14. On July 10, Crescent amended its counterclaim. Dkt. 20.

After two judges recused (Dkt. 27, 29), the case was reassigned to this Court (Dkt. 30). The initial pretrial and scheduling conference has not been set, no scheduling order has been entered, and discovery has not yet begun.

Not until October 29 did Crescent file its application for an "emergency" TRO and preliminary injunction.

## LEGAL STANDARD

A temporary restraining order "is an extraordinary and drastic remedy." *Las Americas Immigrant Advocacy Ctr. v. Paxton*, 2024 WL 4430542, at *3 (W.D. Tex. Sept. 27, 2024). A TRO is "a highly accelerated and temporary form of preliminary injunctive relief, and requires the party seeking such relief to establish the same four elements for obtaining a preliminary injunction." *Horner v. Am. Airlines, Inc.*, 2017 WL 978100, at *1 (N.D. Tex. Mar. 13, 2017) (cleaned up). That is a daunting task as a preliminary injunction itself "is an extraordinary remedy which requires the

movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).

A party seeking a TRO must demonstrate each of the following elements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the [TRO] is denied; (3) that the threatened injury outweighs any prejudice the [TRO] might cause the defendant; and (4) that the [TRO] will not disserve the public interest." *Ocusoft, Inc. v. Walgreen Co.*, 2017 WL 1838106, at *2 (S.D. Tex. May 8, 2017) (Miller, J.) (citing *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 252-53 (5th Cir. 2009); *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir. 1999)).

Because the injunctive relief Crescent seeks is mandatory in nature—meaning it requires a party to act affirmatively rather than merely preserve the status quo—it is even harder to secure. Mandatory preliminary relief "is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see also Justin Indus., Inc. v. Choctaw Sec., L.P.*, 747 F. Supp. 1218, 1220 n.5 (N.D. Tex.) (holding that mandatory injunctions "are even less favored than prohibitory injunctions since they compel a person to act rather than simply maintain the status quo"), *aff'd*, 920 F.2d 262 (5th Cir. 1990). Preliminary injunctive relief "is to be treated as the exception rather than the rule.... This is especially so when the movant seeks mandatory relief compelling action beyond maintaining the status quo—*i.e.*, "specific performance" of a contract." *Digerati Distrib. & Mktg., LLC v. Conradical Sarl*, 2023 WL 5687040, at *2 (W.D. Tex. Aug. 2, 2023).

The movant carries a "heavy burden of showing a clear entitlement to the drastic remedy of a mandatory preliminary injunction." *Tex. v. Ysleta del Sur Pueblo*, 2018 WL 1566866, at *15 (W.D. Tex. Mar. 29, 2018). "Only in rare instances is the issuance of a mandatory preliminary

injunction proper." *Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979). That is even more the case for a mandatory TRO, given the lack of process that attaches to a TRO.

## ARGUMENT

Crescent has to run the table by "clearly" establishing all four of the factors required for a TRO. *See Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). Yet it cannot show a single one:

- Crescent cannot prove it is "substantially likely" to succeed on the merits. W&T validly terminated the Transportation Agreement due to Crescent's defaults and its inability and unwillingness to cure. Crescent knew about the risk of a government shut-in but failed to take commercially reasonable actions to prevent it, never so much as filing anything with the bankruptcy court. Further, Crescent used a terminal production factor to artificially reduce calculations of W&T's shipment volumes and only counters with its CEO's conclusory declaration.

- Crescent cannot prove that it will suffer "irreparable injury." Nothing is imminent: Crescent has not had access to W&T's platform for months, the contracts at issue were terminated more than four months ago, there have been no material changes in the relationship between the parties in the interim, and W&T will grant access for any government-required safety checks. And damages—if any harm could ever be proven—can compensate Crescent.

- Crescent cannot prove that the balance of equities favors it, especially when it requests "emergency" relief at the last minute for no good reason and the relief it requests would upend the status quo and injure W&T.

- Crescent cannot prove that the requested injunction accords with the public interest. Public policy favors accurate reporting and payment of royalties to the federal government and disfavors forcing a private party to continue a contractual relationship with another party that is in breach.

But Crescent's TRO request faces some fatal, preliminary problems even before applying the traditional four factors.

### A.    Crescent Seeks to Upset the Status Quo.

For starters, Crescent asks to upset the status quo, which raises the threshold for emergency relief to an even higher level it cannot overcome. Preservation of the status quo is an important consideration in TRO analysis. *See, e.g.*, *Martinez*, 544 F.2d at 1242-43.

Recognizing the importance of preserving the status quo in a TRO analysis, Crescent desperately tries to claim that mantle. But it cannot roll back time. The contract was terminated before the All-Star Game, and we are now past the World Series. So for more than four months, the contract has not been in effect, and Crescent has not had access to the platform. Those hundred-plus days establish the status quo against which the TRO must be considered.

Crescent's own linguistic gymnastics belie any assertions of status quo preservation as it asks the Court to "return to" or "restor[e]" the status quo at some *other* point in time (Dkt. 32 at 18, 28) and asks the Court to "[r]estor[e]," not preserve, access to W&T's facilities (*Id.* at 26). "Return" and "restore" ask for something different than what is happening in the present. The bottom line is that Crescent is asking the Court to mandate significant changes in the parties' relationship. That means the temporary relief Crescent seeks "is particularly disfavored." *Martinez*, 544 F.2d at 1243.

### B.    Crescent's Delay Dooms its Request for Relief.

Crescent's months-long delay in seeking a temporary restraining order is enough on its own to warrant denial of the TRO. The delay in seeking "emergency" relief militates strongly against various TRO factors.

It is well recognized that this sort of unjustified delay can doom even a claim for a preliminary injunction. "Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 612 F. Supp. 2d 759,

774 (S.D. Tex. 2007) (Rosenthal, J.) (quoting *Wireless Agents, L.L.C. v. T–Mobile USA, Inc.*, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)). "Courts have considered anywhere from a three-month delay to a six-month delay enough to 'militate against' issuing injunctive relief." *Id.* (quoting *Urban Edge Network Inc. v. Webber Mktg. & Consulting, LLC*, 2023 WL 2825697, at *2 (N.D. Tex. Mar. 13, 2023)); *see Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief when movant delayed three months before petitioning the court for temporary relief).

That conclusion is even stronger when the more drastic remedy of a TRO is sought as the movant's delay is what created any time pressure that would prevent the more fulsome process of preliminary injunction briefing and hearing. "[A] party may not sit on its rights, only to spring an application for a temporary restraining order on its opponents at the eleventh hour." *Las Americas*, 2024 WL 4430542, at *4 (cleaned up). Crescent's "delay in seeking injunctive relief is fatal to [its] request for a" temporary restraining order. *Crossover Mkt. LLC v. Newell*, 2022 WL 1797359, at *1 (W.D. Tex. Jan. 12, 2022).

**Likelihood of success on the merits.** **Crescent's unwarranted delay undermines its ability to establish a substantial likelihood of success.** "[C]ourts regularly deny last-minute TRO motions if the movant had all the necessary information to move for a TRO several weeks earlier." *Las Americas*, 2024 WL 4430542, at *6. The reason is that assessing the likelihood of success on the merits "requires the Court to absorb all of the facts" alleged, "review and analyze the applicable caselaw, and then evaluate the strength of the [ ] claims under governing law." *Id.* at *5. Such an analysis "often takes more than just one business day—especially where" the claims "require complex analysis and careful consideration." *Id.* A delayed filing can make "it impossible for the

- 11 -

Court to conduct the cautious and difficult analysis necessary to assess whether [the movant] satisfies the strict legal requirements for a TRO." *Id.*

Crescent's delay is excessive and inexcusable. The contracts terminated over four months ago, yet Crescent has waited all that time to seek "emergency" injunctive relief. In March, W&T issued Crescent its first notice of contractual default. Then, on June 18, W&T issued a second default notice and terminated the contracts. Crescent waited nearly a month, until July 10, to file an amended counterclaim complaining of the contracts' terminations. Even then it did not seek a TRO or preliminary injunction. Instead, Crescent waited another four-plus months to seek those drastic remedies, labelling its motion an "emergency." Crescent suddenly complains of "imminent, irrevocable harm" (Mot. 15) and asserts that it "must conduct valve inspections before the end of October 2024"—even though it waited to file its TRO application until the evening of October 29.

***Irreparable harm.*** **Crescent's months of delay disproves any claim to irreparable injury.** "[A] presumption of irreparable harm may be vitiated by a delay in seeking relief." *Darryl George, et al. v. Greg Abbott, et al*, 2024 WL 4468506, at *5 (S.D. Tex. Oct. 10, 2024). "Delay in seeking emergency relief for allegedly irreparable harm militates heavily against a party's claims of urgency." *Green Ice Tech. v. Ice COLD 2, LLC*, 2017 WL 11667640, at *3 (E.D. Tex. July 7, 2017). "A delay in seeking an injunction has been viewed as a concession or an indication that the alleged harm does not rise to a level that merits an injunction." *Tex. v. United States*, 328 F. Supp. 3d 662, 738 (S.D. Tex. 2018) (Hanen, J.); *see also Embarcadero Techs., Inc. v. Redgate Software, Inc.*, 2017 WL 5588190, at *3 (W.D. Tex. Nov. 20, 2017) ("Undue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable.").

Whenever a party "could have brought [a] TRO motion earlier, but instead s[eeks] a TRO at the eleventh hour, giving" the other party "no real opportunity to respond," that delay "discredits

[the movant's] argument that irreparable injury will result if th[e] Court does not issue" the TRO. *Las Americas*, 2024 WL 4430542, at *5 (quoting *Shores v. Hayashi*, 2023 WL 3230926, at *4 (D. Haw. May 3, 2023)). "When a movant "waits several months after learning of the [complained-of] conduct to move for a preliminary injunction," such "delay rebuts any presumption of irreparable harm." *M-I LLC v. Argus Green LLC*, 2010 WL 11527419, at *4 (E.D. Tex. July 13, 2010).

      ***Balance of the equities.* Crescent's dilatory tactics also weighs the equities strongly against it.** The balance of equities "weighs against litigants who wait to ask for a TRO until the eve of the adverse occurrence that they're asking the Court to prevent." *Id.* A last-minute TRO motion—like Crescent's, filed the evening of October 29, two days before an alleged October 31 deadline—shifts the balance of equities against the last-minute movant. Id. at *4-*5. The movant gains a strategic advantage, while the adversary system suffers for lack of "the best possible presentation of the merits of the case on each side." *Id.* at *4. Such behavior should not be rewarded via emergency relief that could have been considered on a normal schedule but for Crescent's delay.

      **C.    Crescent Cannot Clearly Prove Any of the Required Four Factors.**

      **1.    Crescent Is Unlikely to Succeed on the Merits.**

      Crescent's eleventh-hour application is too little and too late when it comes to its ability to show a substantial likelihood of success on the merits.

      The lengthy TRO application demonstrates that this dispute involves complex and myriad facts. An assessment of the likelihood of success of the claims in this case will involve fact-intensive considerations, yet no discovery has even been conducted and the lawsuit has essentially laid dormant for months. Crescent's delay in seeking relief independently militates against this factor. *Supra* Section B.

Crescent has not and cannot demonstrate a likelihood of success on the merits, much less that the facts lie "clearly" in its favor. Rather W&T validly terminated the Transportation Agreement due to Crescent's defaults. Ex. 2. While the hasty format of Crescent's emergency motion, laden with factual and legal errors, does not lend itself to an adequate response, W&T briefly notes a few of the many reasons Crescent is unlikely to succeed on the merits.

First, Crescent failed to perform its obligations to transport W&T's production, and Crescent's nonperformance was not excused for being due to a valid Force Majeure event. Ex. 4 §9.1. Tellingly, Crescent's lengthy motion does not find the time to quote the key language in the Force Majeure definition in the Transportation Agreement. Nowhere does it quote much less address whether it "exercised[d] reasonable diligence to prevent" the shut-in order as would be required to constitute a Force Majeure event. Ex. 4 at 3. It avoids that language because to be excused, a breach must be *due to* the Force Majeure event and the asserted Force Majeure event must be "outside the reasonable control of the affected Party and not avoidable through the exercise of reasonable diligence and commercially reasonable efforts". *Id.* 5 at 3. That creates a big problem for Crescent because the parties anticipated that governmental authorities could suspend the pipelines and agreed that "reasonable diligence to prevent" such suspension was required. *Id.*

Crescent makes no showing of such diligence, let alone the strong showing needed for the contract to predict it is likely to succeed on this contract claim. Crescent admits it knew when negotiating the Transportation Agreement about the possibility of the shut-in that occurred. Dkt. 32 at 6-7. But despite knowing about the specific risk well before the shut-in occurred, Crescent did not make any filings whatsoever or attempt to be pre-emptively designated the debtor's agent, did not request from the government to carve out the area of the Platform from the shut-in order prior to the shut-in occurring, did not attempt to be assigned or named contract operator by the

- 14 -

debtor with respect to the Platform only, or make plans for a workaround to re-route W&T's production to avoid the shut-in Platform. W&T expected that Crescent would have taken these basic actions in advance of the shut-in given its knowledge of what might happen. Yet W&T failed to exercise any of the reasonable diligence the contract requires.

Given the fact-intensive nature of these issues, it is hard to see how Crescent can show a substantial likelihood of success without a more developed evidentiary record. Indeed, it hardly even tries to show that it took reasonable efforts to avoid the impact of the shut-in. Crescent has never even attempted to explain why it did not or could not take any of these steps. Yet Crescent is asking the Court to conclude that it likely acted with commercial reasonableness to prevent the shut-in—without any answer whatsoever to any of these basic questions about the actions it failed to take.

Second, Crescent breached the Transportation Agreement by applying a terminal production factor to artificially reduce its calculations of W&T's shipments. Crescent's measurements of W&T's January and February production were plainly distorted. Ex. 1(a). Yet Crescent asks the Court to rule that it did not breach the contract by using a terminal production factor based on nothing more than its say-so. Dkt. 32 at 22.

Crescent contends that it did not use a terminal production factor but has not pointed to any evidence other than a conclusory declaration from its CEO saying that it did not. And the only other argument Crescent makes as support for its claim that it did not misallocate is to say that W&T lacks "factual support and common sense." *Id.* at 22. But Crescent has it backwards. Crescent bears the burden here of showing a likelihood of success. *Bay Matrix, Ltd. v. Big Guns Petroleum, Inc.*, 2017 WL 7052221, at *1 (S.D. Tex. Nov. 29, 2017). The declaration makes no attempt to explain the discrepancy between the volumes W&T contends were placed into the

pipeline system and the volumes Crescent allocated to W&T. It can hardly do so without pulling back the curtain and showing what the methodology and the calculations entailed. Nonetheless, Crescent has failed to disclose the specifics of the methodology used or the calculations performed.

Further, W&T properly withheld payment of Crescent's January and February 2024 invoices in light of its dispute over the calculation of allocations. The Transportation Agreement provides that W&T "shall timely pay to [Crescent] all amounts that [W&T] does not affirmatively dispute in writing to [Crescent]". Ex. 4 §8.2. W&T disputed in writing the amounts Crescent claims are owed due to Crescent's misallocation. Exs. 3 and 4. Since these disputed amounts have not been "finally resolved" or "settled," they are not yet due. Ex. 4 §8.2.

Crescent wrongly claims that W&T is obligated to perform its obligations under the Transportation Agreement and the Access Agreement pending final resolution of the parties' dispute, based on Section 15.7 of the Transportation Agreement. Dkt. 32 at 19. However, since the contracts have been terminated via Section 9.3(b), that provision has no force and effect. In fact, Section 15.7 itself acknowledges as much: "The requirements of this Section 15.7 shall not be deemed a waiver of any right of termination under this Agreement." Ex. 4 §15.7. Even if the contracts had not terminated and this obligation could be invoked, performance would be "impossible or impracticable under the circumstances" because the BSSE shut-in order prevents transportation of W&T's production, the purpose of the Transportation of the Agreement.

Crescent's position is thus at odds with the plain terms of the contracts. As a result, it counterclaims will fail. But at a minimum, with heavily disputed factual and legal issues, Crescent cannot show a substantial likelihood of success on such a scant record.

### 2.  Crescent Will Not Suffer Irreparable Injury.

Crescent fares no better on the second required element. It correctly acknowledges that, to be entitled to a TRO, it must make "a clear showing," *Winter v. Nat. Res. Def. Council, Inc.,* 555

U.S. 7, 22 (2008), of "a substantial threat that [it] will suffer irreparable injury" if the TRO is denied. *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998). *See also, e.g.*, *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (movant must satisfy the same elements for a TRO as for a preliminary injunction). But Crescent cannot show any threat of irreparable injury, much less one occurring in the short lifespan of a TRO.

As discussed above, Crescent's months-long delay in seeking a TRO defeats its claim of irreparable harm. *Supra* Section B. That should be game over.

But even putting its delay to the side, there are other fundamental reasons why Crescent cannot show irreparable injury. First, there is no imminent injury. A TRO endures "for a very brief time." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976). Absent consent, a TRO can last no longer than 28 days. *See* Fed. R. Civ. P. 65(b)(2) (TRO can be granted for up to 14 days and can be extended once for another 14 days); *Connell v. Dulien Steel Products, Inc.*, 240 F.2d 414, 418 (5th Cir. 1957) (Rule 65 time limit applies even to TROs issued after notice and hearing). So the movant must show some harm that is likely to occur during that brief window of time. Crescent cannot do so. It will not suffer irreparable harm even during the much lengthier duration of a preliminary injunction. It certainly cannot show any occurring in the next 28 days.

Crescent cites no probative evidence that the supposed October 31 deadline was even real. Its "supporting" affidavit merely parrots the conclusory statement in its motion that "Crescent must conduct valve inspections before the end of October 2024." Dkt. 32 at 11; Crescent Ex. 1 ¶31. If the October 31 deadline were real, Crescent would not have waited until two days before it to seek relief.

And the January 8, 2025 safety inspection deadline, *see* Mot. 11—which wouldn't justify immediate TRO relief in any event—is now moot for purposes of injunctive relief. As noted above, W&T consents to allow access to do that safety testing.

The remainder of any harms Crescent could possibly show are not irreparable because they could be compensated with the remedy that usually applies in contract disputes—damages. It is a bedrock principle that injunctive relief is not available when damages would remedy any injury. *Enter. Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) ("The key word is *irreparable*, and an injury is 'irreparable' only if it cannot be undone through monetary remedies.") (cleaned up); *accord, e.g.*, *Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017).

Crescent alleges only potential economic harms. Boiled down to the essence, Crescent primarily argues that it will lose money from not being able to ship oil for its existing customers and that it may lose customers in the long term. Dkt. 32 at 24-26. The availability of damages means there is no irreparable injury.

While Crescent tries to argue any damages would not be "readily quantifiable" (Dkt. 32 at 26), that is just another way of saying any harm is speculative. And merely speculative injuries cannot support injunctive relief because the harm an injunction seeks to prevent must be imminent. *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011); *Aransas Project v. Shaw*, 775 F.3d 641, 663–64 (5th Cir. 2014). If there is in fact any real harm, Crescent as an established pipeline company should be able to quantify any business losses. *Compare PaR Sys., Inc. v. iPhoton Sols., LLC*, No. 4:10-CV-393-Y, 2011 WL 13128976, at *4 (N.D. Tex. Feb. 11, 2011) (no irreparable injury when it was not difficult for company in the relevant industry to calculate what business would be lost by alleged trade-secret misuse), *with Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991)

- 18 -

(losses difficult to calculate given lack of sales history for novelty t-shirt for which market demand "may be fleeting").[2]

In any event, the main point for now is that none of Crescent's parade of horribles will manifest in the next two weeks. Losses for forgone oil shipments, if any, should be easy to quantify for a 14-day period. Six months after this lawsuit began, there is no indication that Crescent customers are suddenly about to cancel contracts, shut in wells, or sue Crescent. Nothing here justifies a TRO.

### 3.    Crescent Cannot Show that the Equities Favor It.

Crescent is unable to satisfy the third injunction factor because it cannot show that "the balance of equities tips in [its] favor." *Las Americas*, 2024 WL 4430542, at *3. Even if Crescent could somehow show any injury to itself, its delay once again dooms it ability to prove this factor. *Supra* Section B.

In addition to the delay issue, W&T will be harmed if the TRO is granted and the status quo upended. For one thing, a TRO would force W&T to resume its contracts with the party applying the erroneous allocation methodology. *Id.*; *see El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 811–12 (Tex. 2012). In addition to the direct effect on W&T of not receiving proper allocation of its production, this situation hampers W&T's ability to make accurate reports to federal agencies, as it is required to do.

---

[2] Nor does Crescent's allegation of potential reputational injury suffice to show imminent and irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 88-92 (1974) (alleged damage to reputation fell "far short of the type of irreparable injury" needed for a temporary injunction); *Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017) ("reputational injury" does "not necessarily constitute irreparable harm").

4.        **A TRO Will Disserve the Public Interest.**

Crescent also cannot prove that its required TRO will serve the public interest. *See, e.g.*, *Hoover*, 164 F.3d at 224. To the contrary, the requested TRO is against the public interest.

The public has an interest in royalties due to the federal government being correctly reported and funded.

Furthermore, it is against the public interest to compel a private party to continue a contractual relationship with another party that is in breach of their agreement. There is a "strong public policy in favor of preserving the freedom of contract." *El Paso Field*, 389 S.W.3d at 811–12 (cleaned up). An injunction will help Crescent hold W&T hostage and will reinstate contracts that have terminated according to their own terms.

At the very least, these issues should wait for full development in the Court's consideration of the preliminary injunction request. There is no emergency warranting a TRO.

## CONCLUSION

For these reasons, Crescent's application for a TRO should be denied. W&T looks forward to presenting a more fulsome rejoinder to Crescent's motion at a hearing on the preliminary injunction request and in any additional briefing the Court would find useful.

Dated: November 2, 2024

YETTER COLEMAN LLP
Dori Kornfeld Goldman
Texas Bar No. 24041274
S.D. Tex. Bar No. 591632
dgoldman@yettercoleman.com
Jamie A. Aycock
State Bar No. 24050241
S.D. Tex. Bar No. 1233210
jamieaycock@yettercoleman.com
Christian J. Ward
State Bar No. 24033434
S.D. Tex. Bar No. 1012974
cward@yettercoleman.com
Justin S. Rowinsky
Texas Bar No. 24110303
S.D. Tex. Bar No. 3227073
jrowinsky@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000
(713) 632-8002 (Fax)

Respectfully submitted,

*/s/ Gregg J. Costa*

GIBSON, DUNN & CRUTCHER LLP
Gregg J. Costa
Texas Bar No. 24928160
S.D. Tex. Bar No. 32779
gcosta@gibsondunn.com
Kylie Calabrese
Texas Bar No. 241220738
S.D. Tex. Bar No. 3699266
kcalabrese@gibsondunn.com
811 Main Street, Suite 3000
Houston, Texas 77002
(346) 718-6717
(346) 718-6979 (Fax)

SCHOUEST, BAMDAS, SOSHEA, BENMAIER & EASTHAM PLLC
Susan Noe Wilson
Texas Bar No. 15055025
S.D. Tex. Bar No. 15092
snoewilson@sbsb-eastham.com
Marilyn Vilandos
Tex. Bar No. 24034689
S.D. Tex. Bar No. 32332
mvilandos@sbsb-eastham.com
Robert P. Vining
Tex. Bar No. 24049870
S.D. Tex. Bar No35870
rpvining@sbsb-eastham.com
1001 McKinney Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 588-0446
Fax: (713) 574-2942

**ATTORNEYS FOR PLAINTIFF, W&T OFFSHORE, INC.**

- 21 -

## CERTIFICATE OF SERVICE

I certify that on November 2, 2024, a copy of this document was served on all counsel of record using the Court's e-filing system.

*/s/ Gregg J. Costa*
Gregg J. Costa